IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL DEVITO; <br> KEITH HARRIS; <br> MICHAEL SCHULZ; <br> JASON KEHOE; and <br> LUIS FUENTES MALAVE, <br><br> Plaintiffs, <br><br> v. <br><br> AANIIIH NAKODA FINANCE, LLC <br> d/b/a BRIGHT LENDING; <br> BORROWWORKS FINANCIAL, INC.; <br> BORROWWORKS DECISION SCIENCE, INC.; <br> BENJAMIN E. GATZKE; <br> JEFF FORSEY; and <br> DOES 1-10, <br><br> Defendants. | Case No. 1:25-cv-08897 <br><br> Hon. Judge Perry |

## AMENDED COMPLAINT

1. Plaintiffs bring this action against Defendants Aaniiih Nakoda Finance, LLC d/b/a Bright Lending ("Bright Lending"), BorrowWorks Financial, Inc. ("BorrowWorks"), BorrowWorks Decision Science, Inc. ("BWDS"), Benjamin E. Gatzke, Jeff Forsey, and Does 1-10, to secure redress for usurious and illegal loans (such as Exhibits A-L) made to Illinois residents.

2. Plaintiffs seek a declaratory judgment that the loans are void (Count I), damages pursuant to the Illinois Interest Act, 815 ILCS 205/6 (Count II), damages and injunctive and declaratory relief pursuant to the Illinois Predatory Loan Prevention Act, 815 ILCS 123/15-1-1 *et seq.* and the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.* (Count III—the Predatory Loan Prevention Act provides that violations are a violation of the Illinois Consumer Fraud Act), and treble damages under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1964 (Count IV).

**JURISDICTION AND VENUE**

3. The Court has subject matter jurisdiction under 28 U.S.C. § 1331, 18 U.S.C. §1964, 28 U.S.C. § 1337, and 28 U.S.C. § 1367.

4. This Court has personal jurisdiction over Defendants because they:

a. Knowingly participated in the making and collection of unlawful loans to Illinois residents. In similar actions against purported "tribal" lenders, courts have held that personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016), *aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello*, 18cv12277, 2022 U.S. Dist. LEXIS 58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures*, 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

b. Selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group, LLC,* 622 F.3d 754, 760 (7th Cir. 2010).

5. Venue is proper because acts to obtain and collect the loans impacted Plaintiffs in Illinois.

6. Article III is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92

Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

## PARTIES

7. Plaintiffs are citizens of Illinois residing as follows:

   a. Michael DeVito: Aurora, Illinois.

   b. Keith Harris: Effingham, Illinois.

   c. Michael Schulz: Chicago, Illinois.

   d. Jason Kehoe: Orland Park, Illinois.

   e. Luis Fuentes Malave: West Dundee, Illinois.

8. Total Management, Inc. ("TMI") is a Delaware corporation that is now dissolved. Its former principal business address was 1845 Shelby Lane, Fayetteville, AR 72704.

9. Defendant Gatzke is the Chief Executive Officer BorrowWorks. Gatzke was also the Chief Executive Officer of TMI (prior to dissolution). Gatzke resides at 4400 Ledgeview Rd., Fort Worth, TX 76109.

10. As Chief Executive Officer, Gatzke is responsible for, and controls, the management and operations of BorrowWorks, and is therefore personally responsible for its acts, omissions, and violations.

11. Defendant Forsey resides at 7468 Prairieside Drive, Fort Worth, TX 76132. Forsey was previously the Chief Executive Officer of ACC Management, which owned 45 different storefront payday lenders.

12. Defendant BorrowWorks is a Texas corporation with a principal business address of 6445 Harris Parkway, Ft. Worth, TX 76132. Its registered agent is Andrew Selking at that address.

13. Defendant BWDS is a Delaware corporation with a principal business address of 6445 Harris Parkway, Ft. Worth, TX 76132. Its registered agent is Corporation Trust Company, 1209 Orange St., Wilmington, DE 19801.

14. Defendant Bright Lending claims to be an entity formed under the laws of the Fort

3

Belknap Indian Community of the Fort Belknap Reservation of Montana (the "Tribe"). It purports to be a subsidiary of Island Mountain Development Group, also owned by the Tribe, with offices at 353 Old Hays Road, Hays, MT 59527.

15. The Does are other persons and entities involved in the lending scheme.

## FACTS

16. Bright Lending made loans to the Plaintiffs as follows:

| Plaintiff | Date | Exhibit | Principal | Disclosed APR |
|---|---|---|---|---|
| DeVito | 12/10/24 | A | $600 | 699.9622% |
| Harris | 6/12/25 | B | $1,000 | 699.9889% |
| Schulz | 11/22/24 | C | $1,000 | 699.9999% |
| Schulz | 2/27/25 | D | $1,100 | 599.9999% |
| Kehoe | 5/20/25 | E | $2,100 | 324.9999% |
| Fuentes Malave | 2/23/24 | F | $500 | 699.9593% |
| Fuentes Malave | 5/6/24 | G | $600 | 599.9932% |
| Fuentes Malave | 7/15/24 | H | $850 | 499.9999% |
| Fuentes Malave | 11/12/24 | I | $950 | 499.9890% |
| Fuentes Malave | 1/10/25 | J | $1,300 | 499.9247% |
| Fuentes Malave | 6/20/25 | K | $1,650 | 499.9833% |
| Fuentes Malave | 7/24/25 | L | $2,250 | 324.9923% |

17. The loans were obtained for personal, family or household purposes and not for business purposes.

18. Plaintiffs made payments on the loans.

19. Bright Lending wired the loan proceeds of each of the loans to Plaintiffs' respective bank accounts in Illinois.

20. Bright Lending debited payments from the same Illinois accounts.

4

## BRIGHT LENDING'S "RENT-A-TRIBE" SCHEME

21. Bright Lending is an online lender offering loans to consumers at annual interest rates exceeding 300%.

22. In an attempt to evade prosecution under usury laws of states like Illinois, non-tribal owners of online payday lending businesses frequently engage in a business model commonly referred to as a "rent-a-tribe" scheme.

23. Here, and in such schemes, non-tribal payday lenders create an elaborate charade claiming their non-tribal businesses are owned and operated by Native American tribes.

24. The illegal payday loans are then made in the name of a Native American tribal business entity which purport to be shielded from state and federal laws prohibiting usury due to tribal sovereign immunity. However, the tribal lending entity is simply a facade for an illegal lending scheme; all substantive aspects of the payday lending operation—funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections—are performed by individuals and entities that are unaffiliated with the tribe.

25. In exchange for use of the tribe's name, the beneficial owner of the payday lending scheme pays the cooperating tribe a fraction of the revenues generated. While the percentage varies from scheme-to-scheme, the number is almost always in the single digits.

26. However, an entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

27. To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the

5

entities." *Breakthrough* at 1183, 1187-88.

28. These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

29. Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

30. Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

31. Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

32. According to its website, www.brightlending.com, "Aaniiih Nakoda Finance, LLC DBA Bright Lending is an entity formed under the laws of the Fort Belknap Indian Community of the Fort Belknap Reservation of Montana (the 'Fort Belknap Tribe'), a federally-recognized and sovereign American Indian Tribe. Bright Lending is wholly-owned by the Tribe. Bright Lending is a licensed lender authorized by the Tribe's Tribal Regulatory Authority." (Exhibit M)

33. In fact, the Fort Belknap Tribe has no substantive involvement in the operation of

6

Bright Lending, as the enterprise was, at all times relevant to this lawsuit, actually beneficially owned and operated by TMI (prior to dissolution), BorrowWorks, and BWDS, through Gatzke and Forsey, along with their employees, contractors, and investors.

34. Gatzke holds a Master of Business Administration degree from Baylor University. In the university's magazine from Winter 2017, Gatzke notes that he is the "CEO of Total Management Inc." (Exhibit N) He also identifies his employer as "Total Management Inc." and his position as "President" on disclosures to the Federal Election Commission ("FEC") regarding his contributions to the Online Lenders Alliance Political Action Committee. (Exhibit O)

35. Gatzke previously served as Chief Technology Officer at Think Finance, a now-bankrupt company which engaged in a "rent-a-bank" scheme with the First Bank of Delaware, and offered short-term online loans at interest rates often exceeding 200% annually. The loan product was called ThinkCash.

36. After regulators investigated the First Bank of Delaware and ultimately stripped it of its bank charter, Think Finance pivoted to a "rent-a-tribe" model and made loans to consumers under the name Plain Green loans, at interest rates often exceeding 500% annually.

37. Plain Green loans were, ostensibly, made by the Chippewa Cree Tribe of Rocky Boy's Indian Reservation, a small, impoverished tribe in a remote part of Montana. Lawsuits brought by the Attorney General for the Commonwealth of Pennsylvania and the Consumer Financial Protection Bureau resulted in the bankruptcy of Think Finance.

38. Domain Name Registration records from October 16, 2017, show that BrightLending.com was created by and registered to Ben Gatzke, Total Management, Inc., 1845 Shelby Ln., Fayetteville, AR 72704, domains@borrowworks.com. (Exhibit P) Records from January 18, 2018, show the same data. (Exhibit Q)

39. BorrowWorks was the original owner of the Bright Lending logo.

40. The Apple App Store shows BWDS developed the Bright Lending mobile app.

41. Domain Name Registration records from September 13, 2015, show that

greentrustcash.com, another "tribal" lending enterprise supposedly operated by the Tribe, was registered to Jeff Forsey, OPM Communications, 2106 Jenny Lind Rd., Fort Smith, AR 72901, phone: (479) 942-3908, email: jeff@M4us.com. (Exhibit R)

42. The address of OPM Communications, 2106 Jenny Lind Rd., Fort Smith, AR, is the same address as the offices of TMI (prior to dissolution) and is the address listed on Gatzke's FEC disclosures. OPM Communications appears to have never been registered with any Secretary of State as a corporation, trade name, fictitious name, etc. OPM means "other people's money."

43. Since 2011, Forsey has also been the Chief Compliance Officer of BorrowWorks.

44. BWDS develops and utilizes software to predict the repayment abilities of consumers who apply for online loans with exceedingly high interest rates, as well as the propensities of the consumer to actually pay the loans.

45. Software developed by BWDS was utilized in the underwriting of Plaintiffs' loans.

46. BWDS software is written specifically with lenders like Bright Lending in mind, e.g., lenders which charge 300% or more interest rates.

47. At all times, BWDS is aware its software is used in the furtherance of loans with interest rates exceeding 300% annually.

48. TMI (prior to dissolution), BorrowWorks, and BWDS and their contractors and hired agents are in actual control of nearly all aspects of Bright Lending, including underwriting, lending decisions, collection strategies, credit reporting, and the sale of charged-off debts to debt collectors.

49. TMI (prior to dissolution), BorrowWorks, and BWDS and related companies and their contractors and hired agents provided a line of credit to Aaniiih Nakoda Finance, LLC, which was used as working capital to fund loans made by Bright Lending.

50. TMI (prior to dissolution), BorrowWorks, and BWDS and their related companies and investors maintained a security interest in those loans.

51. The line of credit provides Aaniiih Nakoda Finance, LLC with access to the millions

of dollars in working capital it needed to fund loans.

    52.    The line of credit agreement provided:

        a.    The Tribe to waive any sovereign immunity claims in the event of a dispute with TMI, BorrowWorks, and BWDS.

        b.    The Tribe would employ only contractors approved by TMI, BorrowWorks, and BWDS.

        c.    Money due TMI, BorrowWorks, and BWDS would be given priority.

        d.    Various restrictive covenants that gave TMI, BorrowWorks, and BWDS control over the "tribally" operated Bright Lending.

    53.    The Tribe signed a master servicing agreement which required it to approve loans based on the exact specifications of TMI (prior to dissolution), BorrowWorks, and BWDS and their related companies and investors.

    54.    TMI (prior to dissolution), BorrowWorks, and BWDS or their related companies approved Plaintiffs for their loans, in all meaningful ways.

    55.    Any "tribal" approval was simply a charade done for the purpose of providing legal cover, and involved nothing more than a pro forma rubber-stamping of the approval generated by TMI (prior to dissolution), BorrowWorks, and BWDS or their related companies.

    56.    An applicant for a loan from Bright Lending who does not meet the qualifications established by TMI (prior to dissolution), BorrowWorks, and BWDS or their related companies will not be offered a loan.

    57.    The loan approvals were then transmitted to an employee of Aaniiih Nakoda Finance, LLC who may have been located on the Tribe's land, who then rubber-stamped an approval, thus creating, in name only, approval on the Tribe's land.

    58.    The only meaningful contribution the Tribe makes is that TMI (prior to dissolution), BorrowWorks, and BWDS and/or their related companies can claim Bright Lending operates under Tribal law and to invoke the tribe's sovereign immunity to attempt to avoid state usury laws. Only

low-level functions occurred on the Tribe's land, such as verification of employment after TMI (prior to dissolution), BorrowWorks, and BWDS approved a borrower. The Tribe is not permitted to make loans denied by TMI (prior to dissolution), BorrowWorks, and BWDS.

59. The purported beneficial owner of Bright Lending, the Fort Belknap Tribe, is a small, economically depressed, isolated tribe in rural Montana.

60. Despite having few enrolled members, the Fort Belknap Tribe operates, or has operated, more than two dozen online high-interest loan websites, each under a different tribal company's name which is "rented" to a different non-tribal beneficial owner.

61. The Tribe previously had a "rent-a-tribe" scheme active with William C. "Cheney" Pruett, a Texas businessman who owns several dozen storefront high-interest lenders and contracted with the Fort Belknap Tribe to claim ownership of his website, Riverbend Cash (www.riverbendcash.com).

62. The Tribe previously had a "rent-a-tribe" scheme active with Vivus Servicing Ltd., doing business as North Cash (northcashlending.com). Vivus is wholly owned by 4finance, a large, worldwide high-interest lender based in Riga, Latvia.

63. The Tribe previously had a "rent-a-tribe" scheme active with Soaren Management and others, an Arizona-based company, concerning Target Cash Now (targetcashnow.com).

64. The Tribe had a "rent-a-tribe" scheme active with Paul Anthony Pellizzon, a multi-millionaire California developer and one of his companies, Center Ice Servicing, which had offices in Texas, concerning a lending website called The Cash Fairy.

65. Ultimately, the Fort Belknap Tribe retains roughly two cents on the dollar of revenue generated by Bright Lending, after paying various management fees, consulting fees, technology fees, interest on the line of credit, and other sums to LOC, and the like to TMI (prior to dissolution), BorrowWorks, and BWDS.

66. The various fees and interest have to be repaid to TMI (prior to dissolution), BorrowWorks, and BWDS prior to any payments to the Tribe, meaning that the non-tribal

10

economic interests come before those of the Tribe's.

67. In the event a particular loan is charged-off as uncollectable prior to at least the original principal loan amount being paid, TMI (prior to dissolution), BorrowWorks, and BWDS absorb the loss, not the tribe.

68. Thus, TMI (prior to dissolution), BorrowWorks, and BWDS, and not the Fort Belknap Tribe, are the true lenders of the loans made to Plaintiffs, because they have the predominant economic interest in loans made to consumers by Bright Lending.

69. Since nearly all meaningful activity concerning the loans made by Bright Lending do not occur on an Indian reservation, regardless of whether certain administrative aspects are addressed on the Fort Belknap Tribe's land, the loans were not made "on" the reservation.

70. A significant majority of the transactions occur within Illinois—from completing the application to receiving the funds.

71. Plaintiffs, like most customers of Bright Lending, acquired their loans without leaving their homes. The loan proceeds were deposited into their Illinois bank accounts, and withdrawals and attempted withdrawals were made from the same account. Communications, including emails and text messages, were sent to Illinois.

72. The location of the consumer determines where the transaction takes place for jurisdictional purposes. *California v. Iipay Nation of Santa Ysabel,* 898 F.3d 960, 968 (9th Cir. 2018) ("However, the patrons' act of placing a bet or wager on a game of DRB while located in California constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.")

73. Plaintiffs have never set foot on Fort Belknap tribal land in Montana.

## ILLINOIS PROHIBITIONS ON PREDATORY LOANS

74. Effective March 23, 2021, the Illinois Predatory Loan Prevention Act made it unlawful for anyone other than a bank to make loans to Illinois residents at annual percentage rates in excess of 36%. 815 ILCS 123/15-1-1 *et seq*. "Any loan made in violation of this Act is null and

11

void and no person or entity shall have any right to collect, attempt to collect, receive, or retain any principal, fee, interest, or charges related to the loan." 815 ILCS 123/15-5-10.

75. Under 815 ILCS 123/15-10-5(b), "[a]ny violation of this Act, including the commission of an act prohibited under Article 5, constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act."

76. Both before and after March 23, 2021, it was unlawful for anyone who did not have a bank or credit union charter or a consumer lending license issued by the Illinois Department of Financial and Professional Regulation to make loans at more than 9% interest. 815 ILCS 122/1-15, 4-5; 205 ILCS 670/1.

77. Any loans to Illinois residents at more than 9% that are made by unlicensed persons are void and unenforceable. 205 ILCS 670/20(d) ("Notwithstanding any other provision of this Section, if any person who does not have a license issued under this [Consumer Installment Loan] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan."); 815 ILCS 122/4-10(h) ("(h) Notwithstanding any other provision of this Section, if a lender who does not have a license issued under this [Payday Loan Reform] Act makes a loan pursuant to this Act to an Illinois consumer, then the loan shall be null and void and the lender who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan.").

78. Loans made by an unlicensed lender to an Illinois resident at an interest rate exceeding 9% violate the Interest Act, 815 ILCS 205/4, and are subject to statutory damages under 815 ILCS 205/6.

79. Illinois' criminal usury statute provides that the making of a loan by an unlicensed person at more than 20% interest is a felony. 720 ILCS 5/17-59 (formerly 720 ILCS 5/39-1 *et seq.*). It applies to a person who "while either within or outside the State, by his own conduct or that of another for which he is legally accountable," engages in conduct that amounts to an offense if "the

offense is committed either wholly or partly within the State." 720 ILCS 5/1-5.

80. Contracts made in violation of licensing requirements intended to protect the public, or in violation of criminal laws imposing substantial penalties, are void. *Chatham Foot Specialists, P.C. v. Health Care Serv. Corp.*, 216 Ill. 2d 366, 380, 837 N.E.2d 48 (2005). Neither choice of law clauses or other contractual devices can be used to avoid invalidation of loans made at criminally usurious rates. *Madden v. Midland Funding, LLC,* 237 F. Supp. 3d 130, 150 (S.D.N.Y. 2017) ("That New York chose to criminalize such conduct is further evidence that its usury prohibition is a fundamental public policy."); *MacDonald v. CashCall, Inc.,* 16cv2781, 2017 U.S. Dist. LEXIS 64761, 2017 WL 1536427, \*7 (D.N.J., April 28, 2017).

81. The Illinois Department of Financial and Professional Regulation has repeatedly brought cases against unlicensed out of state tribal and other lenders that make loans via the Internet or similar means to Illinois residents in Illinois. *See, e.g., In the Matter of Red Leaf Ventures, LLC,* No. 12 CC 569); *In the Matter of Money Mutual, LLC*, No. 12 CC 408; *In the Matter of Hammock Credit Services*, No. 12 CC 581; *In the Matter of Makes Cents, Inc., d/b/a Maxlend*, No. 17 CC 133.

82. The excessive interest charges imposed by Defendants were willful.

### COUNT I - DECLARATORY AND INJUNCTIVE RELIEF AGAINST ILLEGAL CONDUCT

83. Plaintiffs incorporate paragraphs 1-82.

84. This claim is against all Defendants.

85. There is a controversy between Plaintiffs, on the one hand, and Defendants, on the other, as to whether Plaintiffs must repay the loans made to them.

86. Declaratory relief will resolve such controversy.

87. An injunction is necessary to prevent Defendants from taking any action to collect the void debts.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and against Defendants for:

      i.      Injunctive relief;

      ii.      Declaratory relief;

      iii.      Restitution of all amounts collected;

      iv.      Costs of suit; and

      v.      Such other and further relief as the Court deems proper.

### COUNT II – ILLINOIS INTEREST ACT

88. Plaintiffs incorporate paragraphs 1-82.

89. This claim is against all Defendants.

90. Defendants contracted for and collected loans at more than 9% interest from Plaintiffs, in violation of 815 ILCS 205/4.

91. Plaintiffs are entitled to statutory damages under 815 ILCS 205/6.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and against Defendants for:

      i.      Damages as provided in 815 ILCS 205/6;

      ii.      Attorney's fees, litigation expenses and costs of suit; and

      iii.      Such other and further relief as the Court deems proper.

### COUNT III – PREDATORY LOAN PREVENTION ACT AND ILLINOIS CONSUMER FRAUD ACT

92. Plaintiffs incorporate paragraphs 1-82.

93. This claim is against all Defendants.

94. Defendants contracted for and collected loans prohibited by the Illinois Predatory Loan Prevention Act.

95. Violation of the Predatory Loan Prevention Act is a violation of the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq*.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and against Defendants for:

      i.      Compensatory damages;

      ii.     Punitive damages;

      iii.    Attorney's fees, litigation expenses and costs of suit; and

      iv.    Such other and further relief as the Court deems proper.

## COUNT IV – RICO

96. Plaintiffs incorporate paragraphs 1-82.

97. This claim is against Defendants Gatzke, Forsey, BorrowWorks, BWDS, and the Does, who are the RICO "persons."

98. All loans made by "Bright Lending" to Illinois residents are (a) unenforceable under Illinois law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Illinois law, where (c) the loan was made on or after a date four years prior to the filing of this action, and (d) the usurious rate is at least twice the enforceable rate (9%).

99. The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

100. Bright Lending is an enterprise affecting interstate commerce, in that it is located outside of Illinois and makes loans to Illinois residents via the Internet.

101. Defendants Gatzke, Forsey, BorrowWorks, BWDS, and the Does are associated with this enterprise, in that they operate and manage it.

102. Defendants conducted or participated in the conduct of the affairs of Bright Lending through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. §1962(c).

103. Plaintiffs were deprived of money as a result.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and against Defendants for:

      i.      Treble damages;

      ii.     Attorney's fees, litigation expenses and costs of suit; and

     iii.  Such other or further relief as the Court deems proper.

              Respectfully submitted,

              */s/ Daniel A. Edelman*
              Daniel A. Edelman

Daniel A. Edelman
Heather Kolbus
Alexandra Huzyk
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1800
Chicago, IL 60603
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com
dedelman@edcombs.com
hkolbus@edcombs.com
ahuzyk@edcombs.com

## CERTIFICATE OF SERVICE

       I, Daniel A. Edelman, hereby certify that on August 27, 2025, I electronically filed the foregoing document via the Court's CM/ECF system. I further certify that a copy of the foregoing document was sent via U.S. Mail and email to the following:

| | |
|---|---|
| BorrowWorks Financial, Inc.<br>c/o Timothy W. Billion<br>Robins Kaplan LLP<br>150 E 4th Place, Suite 704<br>Sioux Falls, SD 57104<br>Tbillion@RobinsKaplan.com | BorrowWorks Decision Science, Inc.<br>c/o Timothy W. Billion<br>Robins Kaplan LLP<br>150 E 4th Place, Suite 704<br>Sioux Falls, SD 57104<br>Tbillion@RobinsKaplan.com |
| Benjamin E. Gatzke<br>c/o Timothy W. Billion<br>Robins Kaplan LLP<br>150 E 4th Place, Suite 704<br>Sioux Falls, SD 57104<br>Tbillion@RobinsKaplan.com | Jeff Forsey<br>c/o Timothy W. Billion<br>Robins Kaplan LLP<br>150 E 4th Place, Suite 704<br>Sioux Falls, SD 57104<br>Tbillion@RobinsKaplan.com |

Aaniiih Nakoda Finance, LLC d/b/a
Bright Lending
c/o Rob Roy Smith
Kilpatrick Townsend & Stockton LLP
1420 5th Avenue, Suite 3700
Seattle, WA USA 98101
rrsmith@ktslaw.com

                                              */s/ Daniel A. Edelman*
                                                Daniel A. Edelman

Daniel A. Edelman
Heather Kolbus
Alexandra Huzyk
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1800
Chicago, IL 60603
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com
dedelman@edcombs.com
hkolbus@edcombs.com
ahuzyk@edcombs.com

## **JURY DEMAND**

Plaintiffs demand trial by jury.

>  */s/ Daniel A. Edelman*
>  Daniel A. Edelman

## **NOTICE OF LIEN AND ASSIGNMENT**

      Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.

                                    */s/ Daniel A. Edelman*
                                    Daniel A. Edelman

**DOCUMENT PRESERVATION DEMAND**

   Each Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiffs, the events described herein, any third party associated with any telephone call, campaign, account, loan, sale or file associated with Plaintiff, and any account or loan or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendant.

            */s/ Daniel A. Edelman*
            Daniel A. Edelman

T:\41533\2d Draft Amended Complaint (no TMI)_.WPD